[S.F. No. 24049. Nov. 30, 1979.]

RICHARD B. PAULSEN, JR., Plaintiff and Respondent, v.
GOLDEN GATE UNIVERSITY et al., Defendants and Appellants.

COUNSEL

Jordan, Walsh, Lawrence, Dawson & Carbone, Jordan, Lawrence, Dawson & Carbone, Paul S. Jordan, Michael P. Carbone and Terry D. McShane for Defendants and Appellants.

George J. Alexander and William C. Cunningham as Amici Curiae on behalf of Defendants and Appellants.

Charles Cline Moore for Plaintiff and Respondent.

---

OPINION

MOSK, J.—Defendant Golden Gate University appeals from a judgment in an action for declaratory relief directing it to award plaintiff Paulsen a law degree.[1]

Golden Gate is a nonprofit, private educational institution. Paulsen enrolled at its school of law in 1971 and attended classes there until 1975. Although he was a full time degree student for three years, he failed to satisfy the academic average and unit requirements for a degree and was academically disqualified. His status during the fourth year of study is here in issue.

We are asked to determine whether a private university acts arbitrarily or capriciously when it includes an express no-degree condition in readmitting, for the sole purpose of bar certification, an academically disqualified student. We must also decide whether such a specially enrolled student, upon amassing the number of credits required of degree students, acquires a contractual right to a degree. We conclude that the evidence fails to support the trial court's finding of arbitrary and capricious behavior by the university. In addition, there is no contractual theory that would entitle Paulsen to a degree under the facts of this case.

Paulsen was twice disqualified from further study at Golden Gate because of academic failure. In the first instance, upon petition to Golden Gate's Committee on Academic Standards (hereafter the committee) he was conditionally readmitted as a second year student.[2] However, his academic ineptitude continued, and at the end of his third year Paulsen

---

[1] Paulsen also joined the Dean of Golden Gate University's school of law as a defendant. For convenience, both defendants will be referred to herein as Golden Gate or the university.

[2] He was required to retake a course he had failed in his first year, and could take only a limited number of units during his second year.

was informed by Golden Gate that he had "flunked out." At that point he had neither the requisite grade point average nor the completed course units necessary for a degree. His petition for readmission on probation in order to make up these deficiencies and thereupon graduate was individually reviewed by the committee and rejected.

Paulsen's subsequent attempts to transfer to another law school were unsuccessful because of his poor academic standing. After further discussion with Golden Gate officials, he was allowed by the committee to return for a fourth year so that he could be certified as having studied law for four years; such persons may take the bar examination even if they do not receive a law degree. (Deering's, Rules Regulating Admission to Practice Law (1979 pocket supp.) rule IX, § 91(2)(a) [3B West's Ann. Bus. & Prof. Code (1974 ed., 1979 cum. supp.) foll. § 6069, at pp. 51-52].)

The university expressly advised Paulsen both in writing and in person that his readmission was a limited opportunity and he would not be awarded a law degree even if he received straight "A's" in his fourth year courses; thus Paulsen could not use any of the latter courses to satisfy the basic degree requirements. This was the first time that Golden Gate had imposed such a no-degree condition on a student.

In accordance with the terms of his readmission, Paulsen enrolled in only eight units per semester, four less than the level required of full time degree students. This was the minimum number of units per semester thought needed for bar certification.[3] During the regular and summer sessions, Paulsen enrolled in and completed twelve units, withdrew from six units, and received a "no-credit" report in a two-unit class. This performance left him well short of the requisite units for bar certification. However, the addition of the completed courses to his academic record did boost his cumulative average to precisely the minimal

---

[3]The parties initially erred as to the precise number of academic units required per semester for bar certification. They had both assumed it to be eight, but the proper interpretation of section 91 of the Rules Regulating Admission to Practice Law actually requires nine units per semester. In any event, Paulsen's academic record left him well under even the mistaken lesser unit level. After the mistake was discovered during the spring semester, the university did offer Paulsen a further opportunity to attend summer school to complete the remaining units. By that time he was six units short of the requisite eighteen, yet he enrolled in only a four-unit class during the summer. Shortly after summer classes began he withdrew.

level required for a degree; in addition, he exceeded the numerical course requirement by several units.[4]

At the end of spring term, Paulsen filed a petition with the committee requesting reconsideration of its decisions on his previous petitions. After a hearing at which Paulsen appeared, the request was unanimously denied. Paulsen filed another petition the following fall asking that he be granted a degree. Although this too was rejected, the committee did offer him yet another opportunity to enroll in whatever number of academic units the bar examiners might then require for his bar certification. Paulsen refused, and instead filed this action for declaratory relief.

The trial court found that the university and Paulsen had entered into a series of contracts whereby Paulsen paid tuition in consideration for a legal education and the granting of a degree on completion of the prescribed requirements (see fn. 4, *ante*), and that Paulsen had satisfied those requirements. The court also found that Golden Gate had imposed a no-degree condition on permitting Paulsen to enroll in additional courses after his academic disqualification, but concluded that the condition was "arbitrary, a manifest abuse of discretion, and an unreasonable discrimination between students."

I

There is a widely accepted rule of judicial nonintervention into the academic affairs of schools. (*Connelly* v. *University of Vermont and State Agr. Col.* (D.Vt. 1965) 244 F.Supp. 156, 159-161; *Mustell* v. *Rose* (1968) 282 Ala. 358 [211 So.2d 489, 493-494]; *Militana* v. *University of Miami* (Fla.App. 1970) 236 So.2d 162, 164; *Edde* v. *Columbia University in City of New York* (1957) 8 Misc.2d 795 [168 N.Y.S.2d 643, 644].) However, some courts, including those of California on occasion, have carved out an exception to this rule by permitting limited intervention whenever it is alleged that a university or college has acted arbitrarily or in bad faith. (*Shuffer* v. *Board of Trustees*

---

[4]There are three basic degree requirements for day students at Golden Gate's law school. The first is maintenance of at least a 2.0 cumulative average. An "A" is a 4.0, a "B" is a 3.0, a "C" is a 2.0, and a "D" is a 1.0. Any student unable to achieve a 1.75 average after his first year or a cumulative 2.0 average thereafter may continue only with the permission of the Committee on Academic Standards. Second, a student must complete 84 academic units of study in accordance with the prescribed curriculum. Third, a student must complete three years in residence carrying not less than 24 units each year.

(1977) 67 Cal.App.3d 208, 219-220 [136 Cal.Rptr. 527]; *Wong v. Regents of University of California* (1971) 15 Cal.App.3d 823, 830-832 [93 Cal.Rptr. 502].) While this rule has not heretofore been applied to private schools in California, counsel for appellants concedes a private university may not act arbitrarily or in bad faith (cf. *Frank v. Marquette University* (1932) 209 Wis. 372 [245 N.W. 125, 127]) but denies Golden Gate has done so.

■ In concluding that the no-degree condition placed on Paulsen's fourth year program was unreasonable, the trial court concentrated on the unprecedented nature of that condition; it permitted the introduction into evidence of detailed testimony and exhibits concerning the academic records of other fourth year students who, while assertedly similarly situated, were not subjected to a no-degree condition.

■ "Evidence that [a student] was treated radically different than others in a like situation" may be relevant to a claim that a university acted arbitrarily or in bad faith. (See *Greenhill v. Bailey* (S.D.Iowa 1974) 378 F.Supp. 632, 636, revd. on other grounds (8th Cir. 1975) 519 F.2d 5.) But such evidence is not conclusive of the issue. The student must also show that the difference in treatment in his case was the result of an arbitrary or bad faith decision by the institution. ■ The trial court did not find that Golden Gate's decision to academically disqualify Paulsen at the end of his third year was in any way improper. It did find that the university allowed four other students to return for an additional year without a no-degree condition, and in due course awarded two of them degrees. But such students were not in fact similarly situated to Paulsen. Only he among the fourth-year students had "flunked out" at the end of the normal course of study; and the two who eventually graduated were permitted to continue in the degree program because their earlier deficiencies were due to personal factors unrelated to their academic capability (e.g., serious illness).

The imposition of reasonable conditions on the readmission of academically disqualified students was apparently a regular practice of Golden Gate.[5] Although the no-degree condition may have been novel at the time, this fact in itself does not demonstrate its impermissibility. The only unacceptable conditions are those imposed for reasons extraneous to a student's qualifications for a degree. (*Shuffer v. Board of Trustees, supra,* 67 Cal.App.3d 208, 220.) Here, there was an obvious

[5]As noted, Paulsen himself was previously the beneficiary of such a conditional readmission. (See fn. 2, *ante.*)

relationship between Paulsen's special fourth year program, even if unique, and his remarkably unsatisfactory academic record.

Paulsen's program was much less rigorous than that required of degree students. The no-degree condition was an explicit recognition that he had not satisfactorily managed the academic rigors of the course load in the degree program, and in the trained judgment of the university would not be able to do so. The fourth year students who continued in the degree program were required to take a minimum of 24 academic units per year; Paulsen, in contrast, struggled with a maximum of 16.

The justification for these limits was fully confirmed by Paulsen's inability to complete more than four units in the second term of his fourth year.[6] To direct that Paulsen receive a degree after he had demonstrated his inability to survive academically under the basic conditions required for other degree students would lead to a judicially mandated erosion of the university's academic standards. (See *Mahavonqsanan v. Hall* (5th Cir. 1976) 529 F.2d 448, 449.) The facts thus establish that Paulsen's program was an explicit recognition of his demonstrated limitations, and was neither arbitrary nor discriminatory.

Paulsen's attack on the no-degree condition rests on two equally untenable grounds. First, he claims it was proved that Golden Gate imposed this condition because it was concerned that he would fail the bar examination and thus lower the overall success average of its graduates. But the transcript shows that the trial court specifically declined to make such a finding; and as discussed previously, there was ample academic justification for imposition of the no-degree condition in this case. Second, Paulsen portrays the condition as a punitive action allegedly taken to preclude him from attaining a degree. But he offers no reason why the university would elect to punish or prejudge him. The trial court made no findings of hostility or ill will by Golden Gate, yet Paulsen repeatedly characterizes its actions in those terms. What renders this assertion insupportable is the fact that when the university offered him the no-degree programs, it was under no legal, academic, or moral obligation to readmit him under any circumstances.

Paulsen relies on two cases to illustrate arbitrary conduct by a university: *Miller v. Dailey* (1902) 136 Cal. 212 [68 P. 1029], and *People*

---

[6] As one telling indication of his inability to handle even a limited program, Paulsen attempted to receive credit for one course during the fourth year by submitting a nine-line, handwritten paper in lieu of taking the final examination.

ex rel. *Cecil* v. *Bellevue Hospital Medical College* (1891) 14 N.Y.S. 490, affirmed *per curiam* 128 N.Y. 621 [28 N.E. 253]. Both cases, however, involved students in good standing who were denied the opportunity to take qualifying examinations required for graduation; neither of the students revealed any academic unfitness for a degree, but their universities refused to provide any substantive reasons for preventing them from continuing. In direct contrast to the instant case, both students had successfully completed all other academic requirements until the time of the disputed actions by their respective universities. Golden Gate, on the other hand, not only had solid evidence of Paulsen's academic ineptitude but also gave him ample notice of his deficiencies before it finally proposed the limited no-degree program. Although his subsequent performance casts doubt on the wisdom of even this modest proposal, there is no evidence supporting a finding of arbitrary or bad faith action. There is no question but that the university gave Paulsen a fair hearing and thoughtfully and individually evaluated his academic record and program.

## II

Paulsen also contends he has a contractual right to receive a degree. He relies primarily on *Zumbrun* v. *University of Southern California* (1972) 25 Cal.App.3d 1, 10 [101 Cal.Rptr. 499, 51 A.L.R.3d 991], in which the Court of Appeal declared that "[t]he basic legal relation between a student and a private university or college is contractual in nature." In *Zumbrun,* the court held that a student who had paid tuition for a course had a cause of action for breach of contract after the instructor failed to deliver the anticipated number of lectures provided for in the university catalogue. In the present case, however, the framing of the student-university relationship in contractual terms is of no assistance to Paulsen's cause.[7] It is undisputed—and the trial court found—that after Paulsen's academic disqualification Golden Gate agreed to allow him to enroll in additional courses only on the express condition that he would *not* be eligible for a degree. Any contract between the parties would therefore have included that condition, and by its terms would have precluded awarding Paulsen a degree under any circumstances.

---

[7]Although the framing of the student-university relationship in contractual terms may provide a potential source for some student curricular and extracurricular rights, it incorrectly portrays the manner in which the parties themselves view the relationship. (*Developments in the Law: Academic Freedom* (1968) 81 Harv.L.Rev. 1045, 1147.)

Paulsen also asserts that the university violated the procedures prescribed in its catalogue by attempting to include him as a nondegree student. He notes that nondegree students and auditors are described in the catalogue as attorneys or graduates of an accredited law school; the only other catalogue category is the degree student, and he contests the university's power to expand the nondegree category to include him. But Golden Gate never in fact designated Paulsen as a nondegree student, nor is there any reason to limit the university to such wooden designations. Allowing a university flexibility in shaping its academic programs to meet individual needs usually redounds to a student's favor; indeed, Paulsen himself would not have been twice readmitted if the university had been limited to the "fail entirely or enroll unconditionally" policy that he now asserts governs its conduct. The attempt to use catalogues or similar published material to freeze the academic relationship into a rigid mold would lead to a stifling of both individual attention and equitable arrangements in the student's behalf.

Paulsen's remaining arguments on his contract theory have been considered and are unpersuasive.

The judgment is reversed.

Bird, C. J., Tobriner, J., Clark, J., Richardson, J., Manuel, J., and Newman, J., concurred.